UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DEBRA FAVILA,                          )
                                       )
           Plaintiff,                  )
                                       )
                                       )
v.                                     )      No. 2:14-CV-250
                                       )      (PHILLIPS/SHIRLEY)
CAROLYN W. COLVIN,                     )
Acting Commissioner of Social Security,)
                                       )
           Defendant.                  )

**<u>MEMORANDUM AND ORDER</u>**

Now before the District Court is Plaintiff's Motion for Summary Judgment and Brief in

Support [Doc. 17] and Defendant's Motion for Summary Judgment and Memorandum in

Support [Docs. 26 & 27]. Plaintiff Debra Favila seeks judicial review of the decision of the

Administrative Law Judge ("ALJ"), the final decision of the Defendant Carolyn W. Colvin,

Acting Commissioner of Social Security ("the Commissioner").

Plaintiff filed an application for disability insurance benefits ("DIB") in October 2010

with an alleged onset date of August 31, 2010. [Tr. 215-18]. The Social Security Administration

denied Plaintiff's application initially and upon reconsideration. [Tr. 89-96]. Plaintiff timely

filed two requests for administrative hearings, and she appeared before Administrative Law

Judge, Peri Collins, in Dallas, Texas on June 21, 2012 and November 8, 2012. [Tr. 117-30, 74,

37]. The ALJ issued an unfavorable decision on January 29, 2013. [Tr. 16-36]. Plaintiff filed

her appeal of the decision, which the Appeals Council declined to review on June 18, 2014. [Tr.

14-15, 1-6].

Having exhausted her administrative remedies, Plaintiff filed a Complaint with this Court

on August 14, 2014, seeking judicial review of the Commissioner's final decision under Section

205(g) of the Social Security Act. [Doc. 1]. The parties have filed competing dispositive

motions, and this matter is now ripe for adjudication.

## I.     ALJ FINDINGS

The ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

> 2. The claimant engaged in substantial gainful activity (SGA) during the following periods: from the alleged onset date (AOD) through September 24, 2010 (20 CFR 404.1520(b) and 404.1571 *et seq.*)

> 3. However, there has been a continuous 12-month period[] during which the claimant did not engage in substantial gainful activity. The remaining findings address the periods since September 24, 2010 during which the claimant did not engage in substantial gainful activity.

> 4. The claimant has the following severe impairments: asthma, left trochanteric bursitis, depression, gastroesophageal reflux disease (GERD), and fibromyalgia (20 CFR 404.1520(c)).

> 5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

> 6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently. She is able to stand and/or walk six hours in [an] eight-hour workday and can sit six hours in an eight-hour workday. She can occasionally climb ramps and stairs, but must avoid all climbing of ropes, ladders, and scaffolds. She must avoid even moderate exposure to airborne irritants such as dust, fumes, gases, and poor ventilation. From a mental standpoint, the claimant retains [the ability] to understand, remember, and carry out detailed, but not complex instructions.

2

7. The claimant is capable of performing past relevant work as an office clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

8. The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2010, through the date of this decision (20 CFR 404.1520(f)).

[Tr. 21-30].

## II.    DISABILITY ELIGIBILITY

This case involves an application for DIB. An individual qualifies for DIB if he or she: (1) is insured for DIB; (2) has not reached the age of retirement; (3) has filed an application for DIB; and (4) is disabled. 42 U.S.C. § 423(a)(1).

"Disability" is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Disability is evaluated pursuant to a five-step analysis summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his

3

impairment must be severe before he can be found to be disabled.

> 3.   If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

> 4.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

> 5.   Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors (age, education, skills, etc.), he is not disabled.

Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520).  Plaintiff bears the burden of proof at the first four steps.  Walters, 127 F.3d at 529. The burden shifts to the Commissioner at step five.  Id.  At the fifth step, the Commissioner must prove that there is work available in the national economy that the claimant could perform.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) (citing Bowen v. Yuckert, 482 U.S. 137, 146 (1987)).

## III.   STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir. 2009) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).  If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed.  Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g).   Substantial evidence is "more than a scintilla of evidence but less than a

4

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. Crisp v. Sec'y of Health & Human Servs., 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001) (quoting Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." Walters, 127 F.3d at 528.

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004). The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.

An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." Wilson, 378 F.3d at 546-47. Thus, an ALJ's procedural error is harmless if his ultimate decision was

5

supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard. See Id. at 547.

On review, Plaintiff bears the burden of proving his entitlement to benefits. Boyes v. Sec'y. of Health & Human Servs., 46 F.3d 510, 512 (6th Cir. 1994) (citing Halsey v. Richardson, 441 F.2d 1230 (6th Cir. 1971)).

## IV.    EVIDENCE

### A.    *Medical Evidence*

Plaintiff filed an application for DIB in October 2010 with an alleged onset date of August 31, 2010. [Tr. 215-18]. Plaintiff was born on December 5, 1964 and stated that she completed the twelfth grade. [Tr. 256, 269]. Plaintiff reported past relevant work as a customer service representative and data entry clerk. [Tr. 269]. She alleged that she ceased work due to "burned lungs," asthma, lupus, autoimmune disorders, reactive attachment disorder, and acid reflux disease. [Tr. 268].

Plaintiff sought treatment at Huguley Memorial Medical Clinic in 2010 and 2011. [Tr. 370-406, 464-508]. Plaintiff was examined for gastroesophageal reflux disease ("GERD") in October of 2010. [Tr. 374]. She presented with a persistent cough that had lasted for two months and Dr. Hisham Bismar was concerned that "part of her respiratory symptoms [were] due to acid reflux symptoms." [Id.]. Plaintiff also complained of nosebleeds and shortness of breath. [Tr. 378]. Plaintiff was admitted to the hospital, and Dr. Tariq Unis found Plaintiff had a perforated nasal septum and scheduled a CT scan. [Tr. 386-87, 465]. The CT scan of Plaintiff's chest was unremarkable with "very small pleural effusion within the dependent posterior sulcus" and "a small amount of pericardial infusion." [Tr. 388]. The CT scan of her sinuses revealed "mucosal thickening in the floor of the maxillary sinuses bilaterally. Rest of the sinuses are

6

clear. Anterior septal defect was noted and prominent deviation of nasal septum was noted."

[Id.]. An x-ray of Plaintiff's chest was normal with "no cavitary lesions." [Id.]. Plaintiff's

prescriptions for steroids and antibiotics were continued. [Id.]. A contrast-enhanced CT of

Plaintiff's chest was performed on December 13, 2010, revealing "[p]robably small bilateral

persistent pleural effusions . . . Some of this may be due to chronic pleural thickening. No other

intrathoracic disease. There are no masses or lymphadenopathy in the thorax." [Tr. 506].

Plaintiff followed up with Dr. Sonia Bajaj, a board certified rheumatologist, after discharge from

the hospital. [Tr. 516]. Dr. Bajaj noted that during her hospital admission Plaintiff was

diagnosed with "severe GERD with Barrett's esophagus . . . She was also found to have nasal

perforation. CT of the sinuses and chest were unremarkable." [Id.]. Dr. Bajaj diagnosed bursitis

and severe shortness of breath and noted a positive antinuclear antibody test "of unclear

significance." [Tr. 516-17].

Plaintiff was treated by Dr. Hisham Bismar from September 2010 through November

2012. [Tr. 407-25, 536-73, 756-73, 782-88]. Dr. Bismar examined Plaintiff on September 2,

2010 for a persistent cough. [Tr. 412]. Plaintiff complained of difficulty breathing and

explained that "there [may be] mold in the old building where she work[s]." [Id.]. Dr. Bismar

noted that Plaintiff was taking Prednisone with positive results. [Id.]. Plaintiff followed up with

Dr. Bismar after her discharge from the hospital. [Tr. 520]. Dr. Bismar assessed "[a]cute

exacerbation of asthma, continue current care, increase steroids, stay off work and hope Xolair

will help." [Tr. 521]. In January 2011, Plaintiff reported chest pain, persistent coughing,

swelling in her hands and feet, fatigue, and difficulty standing for long periods of time. [Tr.

513]. Dr. Bismar's assessment included "resolving exacerbation of asthma, continue current

regimen, taper Prednisone[.]" [Tr. 538]. On September 19, 2012, Dr. Bismar completed a

Pulmonary RFC Questionnaire. [Tr. 769-73]. Dr. Bismar noted that Plaintiff suffered from "[a]cute exacerbation of asthma" with shortness of breath, fatigue, chest tightness, wheezing, acute coughing and bronchitis. [Tr. 769]. He reported that Plaintiff suffered asthma attacks approximately two to three times a week, severe at times, aggravated by lung irritants, and lasting five to ten minutes. [Tr. 770]. He noted that inhalers helped and that Plaintiff's anxiety contributed to her symptoms and functional abilities. [Id.]. Dr. Bismar found that Plaintiff's symptoms constantly affected her attention and concentration and that she was "[i]ncapable of even 'low stress' jobs[.]" [Id.]. He assessed that Plaintiff could walk 2 city blocks at the most, sit for 1 hour at a time, stand for 0 minutes at a time, and stand and walk for less than 2 hours in an 8-hour workday. [Tr. 771]. Dr. Bismar concluded that Plaintiff would be absent from work more than four times a month. [Tr. 773].

Plaintiff sought treatment for joint pain at University of Tennessee Southwestern Medical Center ("UT") in 2011 and 2012. [Tr. 620-755]. In April of 2012, Dr. David Minna diagnosed Plaintiff with a positive antinuclear body test, generalized osteoarthritis, unspecified myalgia and myositis, and carpal tunnel syndrome ("CTS"). [Tr. 633]. He noted that Plaintiff's joint pain could be a result of "secondary fibromyalgia[.]" [Id.]. Plaintiff stated that the medication "completely resolved her foot pain. Her hip pain flared with her hands and foot complaints, but are doing well today." [Tr. 631]. Plaintiff had joint tenderness upon examination and full range of motion in her shoulders and spine. [Tr. 632]. X-rays of her hands, feet, and pelvis showed no significant arthrosis and Plaintiff did not demonstrate any synovitis. [Id.]. Plaintiff's pain was assisted by low doses of Naprosyn and her nonsteroidal anti-inflammatory ("NSAID") therapy was continued, along with a prescription of Tramadol for pain management. [Tr. 633]. Dr. Minna assessed a "working diagnosis" of fibromyalgia because the x-rays of her hands, feet, and

8

pelvis revealed no signs of osteoarthritis. [Id.]. In July 2012, Plaintiff reported paresthesias in her hands and feet and complained she was often dropping things. [Tr. 739]. Plaintiff denied depressive symptoms and her physical examination was virtually unchanged. [Id.; see Tr. 22]. X-rays of her hands did "not reveal any significant arthrosis. Normal bone mineralization. No fracture or dislocation. No evidence for erosive arthropathy." [Tr. 741]. Her treatment plan was continued. [Id.]. In July 2012, Plaintiff's diagnoses included unspecified myalgia and myositis, CTS, NSAID, and generalized osteoarthritis, along with a "working diagnosis" of fibromyalgia. [Tr. 727, 741].

Dr. James Wright submitted a case assessment on February 10, 2011 and found that Plaintiff did not have any severe medically determinable impairments. [Tr. 463]. Freedom Disability Services representative, Stephanie Comins, conducted an interview with Plaintiff. [Tr. 575]. She reported that Plaintiff "suffers with a constant blocked and stuffy nose. Has constant sneezing, itching, watery eyes . . . feels constant tightening of chest, she is waken up in the middle of night feeling suffocated and out of breath. Even taking medication and having 2 allergenic shots does not help her much." [Id.].

Dr. Samir Wahby conducted a consultative psychological examination on April 13, 2011. [Tr. 577-79]. Dr. Wahby noted that Plaintiff "walked very slowly as she has difficulty breathing. She stated she is always gasping for air. She gets anxiety attacks because of the breathing difficulties and asthma. She has asthmatic attacks constantly and is afraid she will die any minute." [Tr. 577]. Plaintiff reported that her daily activities consisted of staying at home, and she stated she could no longer attend church or "get out of the house" due to asthmatic attacks. [Id.]. Dr. Wahby noted that Plaintiff was "very depressed" and "feels hopeless and helpless." [Tr. 578]. Dr. Wahby assessed Plaintiff with major depression, "[a]sthmatic attacks of unknown

9

etiology with pulmonary impairment[,]" and a Global Assessment of Functioning ("GAF") score of 30. [Tr. 578]. Dr. Wahby concluded that Plaintiff's "prognosis is poor due to rapid deterioration of her physical condition and her inability to cope with it. She can handle her own funds[.]" [Id.].

Dr. Jean Germain submitted a non-examining psychological RFC assessment on May 3, 2011. [Tr. 580-96]. Dr. Germain diagnosed Plaintiff with major depression and found she was mildly limited in activities of daily living and social functioning, moderately limited in maintaining concentration, persistence, or pace ("CPP"), and had no episodes of decompensation. [Tr. 587, 594]. Dr. Germain noted that the "totality of the evidence indicates no mental health problems with treating source except for one passing mention indicating some potential of depression and anxiety disorder secondary to her medical condition." [Tr. 596]. Dr. Germain explained that "[t]hough claimant complains of poor focus and respiratory problems interfered with her completing that portion of the [mental status exam], there is no indication that claimant's focus and concentration are poor, and in fact when the respiratory problems are not acting up, claimant is highly functional and has hobbies and does tasks where focus and concentration need to be [within normal limits]." [Id.].

Dr. Kelvin Samaratunga submitted a non-examining physical RFC assessment on June 1, 2011. [Tr. 598-605]. Dr. Samaratunga assessed that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, sit, stand, or walk for up 6 hours in an 8-hour workday, and was unlimited in her ability to push and pull. [Tr. 599]. He found that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations but should avoid exposure to fumes, odors, dusts, gases, and poor ventilation. [Tr. 600-02].

### B. Other Evidence

The ALJ conducted administrative hearings on June 21, 2012 and November 8, 2012 in which Plaintiff and vocational experts ("VE"), Susan Brooks and Karyl Kuuttila, testified. [Tr. 37-81]. The ALJ issued an unfavorable decision on January 29, 2013. [Tr. 16-36]. The ALJ found that Plaintiff's severe impairments included asthma, left trochanteric bursitis, depression, GERD, and fibromyalgia. [Tr. 22]. The ALJ found that Plaintiff's alleged impairments of arthritis, narcolepsy, sleep apnea, carpal tunnel syndrome, autoimmune disease, and anxiety were non-severe. [Id.]. In determining Plaintiff's RFC, the ALJ accorded Dr. Bismar little weight because he did not fully complete the questionnaire and "the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported." [Tr. 29]. The ALJ granted that state agency consultants "the greatest weight." [Tr. 28]. The ALJ concluded that Plaintiff was capable for performing past relevant work as an office clerk based on the testimony of VE Brooks. [Tr. 30].

## V.    POSITIONS OF THE PARTIES

The Plaintiff argues that the ALJ erred in classifying her alleged carpal tunnel syndrome as a nonsevere impairment. The Plaintiff further contends that the ALJ's RFC assessment is flawed as he failed to properly weigh the medical evidence. Specifically, Plaintiff argues that the ALJ did not correctly apply the treating physician rule to Dr. Bismar and improperly considered Dr. Germain's opinion. Finally, Plaintiff contends that the ALJ erred at step five in that her assessed RFC is inconsistent with the demands of her past relevant work.

The Commissioner responds that there is substantial evidence to find Plaintiff's alleged carpal tunnel was not a severe impairment. The Commissioner further argues that substantial evidence supports the ALJ's consideration of the medical evidence and RFC assessment.

Finally, Commissioner responds that Plaintiff's past relevant work as an office clerk is consistent with her RFC.

**VI.     ANALYSIS**

The Court will address each of the issues presented by Plaintiff in turn.

**A.     Severe Impairments**

The Plaintiff argues that the ALJ's RFC was not based on the record as a whole. [Doc. 17 at 16]. However, the Plaintiff's argument focuses solely on the ALJ's findings at step two. [See id. at 16-19]. Plaintiff contends that the ALJ erred in classifying her carpal tunnel syndrome as non-severe. [Id.]. The Commissioner argues that the ALJ's determination was based on substantial evidence as the Plaintiff testified that she did not have carpal tunnel syndrome. [See Doc. 27 at 15-16]. The Court limits its analysis at this junction to Plaintiff's contention that the ALJ erred in classifying her CTS as nonsevere and concurs with the Commissioner. The undersigned will address Plaintiff's RFC in detail below.

As mentioned above, at step two of the sequential evaluation process, "the ALJ must find that the claimant has a severe impairment or impairments" to be found disabled. Farris v. Sec'y of Health & Human Servs., 773 F.2d 85, 88 (6th Cir. 1985); see 20 C.F.R. § 404.1520(a)(4)(ii). To be severe, an impairment or combination of impairments must "significantly limit[] your physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). Step two has been described as "*de minimis* hurdle in the disability determination process." Higgs v. Brown, 880 F.2d 860, 862 (6th Cir. 1988). An impairment should be classified as nonsevere "only if the impairment is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" Farris, 773 F.2d at 90 (citing Brady v. Heckler, 724 F.2d 914,

12

920 (11th Cir.1984)).

"[O]nce any one impairment is found to be severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps." McGlothin v. Comm'r of Soc. Sec., 299 F. App'x 516, 522 (6th Cir. Oct. 31, 2008) (citing Anthony v. Astrue, 266 F. App'x 451, 457 (6th Cir. Feb. 22, 2008)); see also 20 C.F.R. § 416.945(a)(2) (explaining that "[i]f you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 416.920(c), 416.921, and 416.923, when we assess your residual functional capacity.").

Therefore, it is "legally irrelevant" that an impairment was determined as non-severe if the ALJ finds other severe impairments. See McGlothin v. Comm'r of Soc. Sec., 299 F. App'x 516, 522 (6th Cir. 2008) (reasoning that "because the ALJ found that [Plaintiff] has some severe impairments, he proceeded to complete steps three through five of the analysis. It then became "legally irrelevant" that her other impairments were determined to be not severe.") (quoting Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988)). The court in Hamilton v. Sec'y of Health & Human Servs., clarified that the rule in Farris is inapplicable where the ALJ continues the five-step disability analysis. 991 F.2d 795 (6th Cir. 1993) (holding that Farris is inapplicable "because the ALJ did not stop his consideration of claimant's [impairment] at Step 2 of the sequential evaluation process. Rather, the ALJ went through Step 5 of the process[.]").

In this matter, the Court finds that the ALJ's determination that Plaintiff's alleged carpal tunnel syndrome was not a severe impairment was supported by substantial evidence. The ALJ noted that Plaintiff complained of "numbness and pain in her hands related to carpal tunnel syndrome, and explained:

> [S]he testified that her doctor told her that she does not have carpal

13

> tunnel syndrome. She also declined a nerve conduction study due
> to lack of insurance . . . The claimant was prescribed night splints
> for her wrists, which she initially reported improved her
> symptoms, but eventually the claimant stopped using the splints . .
> . Without a diagnosis supported by acceptable clinical and
> diagnostic techniques, any allegation of carpal tunnel syndrome is
> found to be not a medically determinable impairment, and thus will
> not be considered in the following functional capacity.

[Tr. 22].

The Court notes that the record does not fully support this statement. Plaintiff's

treatment records from UT contain a consistent diagnosis and history of CTS. [See Tr. 633, 727,

741]. Further, the Court finds that the record is absent a clear statement from Plaintiff that she

did not have carpal tunnel syndrome. During the administrative hearing on November 8, 2012,

the ALJ asked: "Now Dr. Minna mentioned he thought it might – you might have carpal tunnel.

Has he indicated that he feels confident that it's fibromyalgia rather than carpal tunnel?" [Tr. 59].

The Plaintiff responded: "Yes. He did mention that there is an arthritis that causes the carpal

tunnel. I don't – never went any further with it." [Id.]. The ALJ then questioned Plaintiff about

her pain medication and she testified that Neurontin or gabapentin helped with "the fibromyalgia

at times[.]" This exchange does not reflect a clear statement from Plaintiff that she does not have

CTS. She only stated in the affirmative that she believed she may have arthritis that contributed

to her CTS. [See id.].

However, the Court finds that any error in the ALJ's reasoning was harmless. The record

indeed reflects various diagnoses, treatment plans, and symptoms of joint and muscle pain,

characterized throughout the record as CTS, osteoarthritis, fibromyalgia, myalgia, or myositis.

[See 620-755]. The Court finds that the ALJ's decision to classify Plaintiff's CTS as non-severe

was supported by substantial evidence. The ALJ weighed Plaintiff's medical records from UT

and determined that Plaintiff's fibromyalgia, as opposed to her alleged CTS, was a severe

impairment.  The record supports this finding because, although Dr. Minna's diagnoses included CTS and osteoarthritis, he consistently stated that her pain was likely caused by fibromyalgia. [See Tr. 633, 741-42].  Further, the ALJ is correct in noting that Plaintiff was "not compliant" with her prescription for night splints and that a Nerve Conduction Study ("NCS") was not administered due to lack of insurance.  [Tr. 742].  This evidence weighs in favor of classifying Plaintiff's CTS as non-severe because Plaintiff declined to pursue a course of treatment that was effective in relieving her pain, [Tr. 639], (thereby decreasing the likelihood that Plaintiff's hand pain was as debilitating as she alleges) and the absence of a NCS inhibits a definitive diagnosis of CTS.

Regardless, even if the ALJ erred in classifying Plaintiff's CTS as non-severe, such an error was harmless and legally irrelevant.  The ALJ considered Plaintiff's joint pain and muscle tenderness throughout her decision.  [See Tr. 22-30].  The ALJ specifically considered Plaintiff's complaints of pain in her hands and feet, joint pain and swelling, the working diagnosis of fibromyalgia, X-rays, treatment plans, medications, and Plaintiff's statement of dropping things due to hand pain and CTS symptoms.  [Tr. 27].  By finding that the Plaintiff had several severe impairments, Plaintiff won step two of the ALJ's disability determination.  Further, in determining Plaintiff's RFC, the ALJ stated that "[i]n making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." [Tr. at 25].  The Court notes that this statement is likely boilerplate and included in most disability decisions.  However, the ALJ did as promised and, as explained above, fully considered Plaintiff's impairments, severe and non-severe, in determining her RFC.  [See Tr. 27].  It matters not that the ALJ stated she would not

15

consider Plaintiff's CTS in assessing Plaintiff's RFC, [see Tr. 22], because she did so in practice, specifically considering Plaintiff's hand and wrist pain, including her treatment records, medication, and subjective complaints, in determining her functional abilities. [See Tr. 25-30]. Because the ALJ continued in her disability analysis and considered Plaintiff's severe and nonsevere impairments at step four, it is inconsequential that the ALJ found Plaintiff's CTS to be nonsevere. The Court finds that any error on behalf of the ALJ at step two was harmless.

## B.    RFC Analysis and Consideration of the Medical Evidence

Next, Plaintiff argues that the ALJ erred in her consideration of the medical evidence, specifically in regards to Dr. Bismar and Dr. Germain. [See Doc. 17 at 7-15]. The Court disagrees.

An ALJ is responsible for determining a plaintiff's RFC after reviewing all the relevant evidence of record. Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 728 (6th Cir. 2013). An ALJ may consider both medical and non-medical evidence in reaching an RFC determination. Id. A plaintiff's RFC is the most a plaintiff can do despite his or her impairments. 20 C.F.R. § 404.1545(a)(1). In other words, the RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 240 (6th Cir. 2002). Moreover, "'[a] claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.'" Griffeth v. Comm'r of Soc. Sec., 217 F. App'x 425, 429 (6th Cir. Feb. 09, 2007) (quoting Yang v. Comm'r of Soc. Sec., No. 00–10446–BC, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)).

A court will not disturb an ALJ's RFC determination so long as the finding is supported

16

by substantial evidence. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 477 (6th Cir. 2003). However, in determining a claimant's RFC, the ALJ must "make findings of fact" as to her functional and physical limitations. Simpson v. Colvin, 3:11-0481, 2013 WL 4456383, at *17 (M.D. Tenn. Aug. 16, 2013) adopted by, 3:11-CV-00481, 2013 WL 4780082 (M.D. Tenn. Sept. 4, 2013). Further, the ALJ "must 'articulate with specificity reasons for the findings and conclusions that he or she makes' to facilitate meaningful judicial review." Wright v. Astrue, 1:07-CV-226, 2009 WL 890051, at *1 (E.D. Tenn. Mar. 26, 2009) (quoting Bailey v. Comm'r of Soc. Sec., 1999 WL 96920, *4, (6th Cir. Feb. 2, 1999)).

Under the Social Security Act and its implementing regulations, an ALJ will consider all the medical opinions in conjunction with any other relevant evidence received in order to determine a claimant's RFC. 20 C.F.R. § 404.1527(b). An ALJ will consider "every medical opinion" received and will give controlling weight to the opinions of treating physicians. See 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). Where a treating physician's opinion does not garner controlling weight, the appropriate weight to be given an opinion will be determined based upon the following factors: length of treatment, frequency of examination, nature and extent of the treatment relationship, amount of relevant evidence that supports the opinion, the opinion's consistency with the record as a whole, the specialization of the source, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6).

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ must give "good reasons" for the weight given to a treating source's opinion in the decision. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). A decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case

17

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996).

Nonetheless, although a treating physician's diagnosis is entitled to great weight, "the ultimate decision of disability rests with the administrative law judge." Walker v. Sec'y of Health & Human Servs., 980 F.2d 1066, 1070 (6th Cir. 1992) (citing King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984)). An ALJ does not measure medical evidence in a vacuum, but rather considers physician opinions in conjunction with the record as a whole. See 20 C.F.R. § 404.1527(b) (explaining that in considering medical opinions, the SSA "will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."). The agency will consider such evidence as "statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work." 20 C.F.R. § 404.1529(a).

Therefore, even if the ALJ fails to properly apply the treating physician rule, if substantial evidence exists to support the ALJ's determination of the claimant's RFC based on other relevant evidence, such an error will be found harmless. See Francis v. Comm'r Soc. Sec. Admin., 414 F. App'x 802, 804-05 (6th Cir. 2011) (holding that the regulations require only "good reasons" for the weight assigned a treating physician, "not an exhaustive factor-by-factor analysis," and finding that the ALJ's failure to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2) was harmless error because "the ALJ cited the opinion's inconsistency with the objective medical evidence, [Plaintiff's] conservative treatment and daily activities, and the assessments of [Plaintiff's] other physicians. Procedurally, the regulations require no more.");

18

<u>Friend v. Comm'r of Soc. Sec.</u>, 375 F. App'x 543, 551 (6th Cir. 2010) (explaining that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

Non-treating physicians' opinions are not subject to controlling weight. Although an ALJ is "not bound by any findings" made by non-treating physicians, the ALJ "must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence[.]" 20 C.F.R. § 404.1527(e)(2)(i). The ALJ must evaluate a consultative physician's opinion using the relevant factors in 20 C.F.R. § 404.1527(c)(2-6), the same factors used to analyze the opinion of a treating physician. <u>See</u> 20 C.F.R. § 404.1527(e)(2)(ii); <u>Jericol Mining, Inc. v. Napier</u>, 301 F.3d 703, 710 (6th Cir. 2002) ("We believe that the same factors that justify placing greater weight on the opinions of a treating physician are appropriate considerations in determining the weight to be given an examining physician's views."); <u>Sommer v. Astrue</u>, No. 3:10-CV-99, 2010 WL 5883653, at *6 (E.D. Tenn. Dec. 17, 2010) (internal citations omitted) ("The Regulations and Rulings require an ALJ, in the absence of a treating source who enjoys controlling weight, to weigh the opinions of one-time examining physicians and record-reviewing physicians under the regulatory factors, including supportability and consistency.") (citing 20 C.F.R. § 404.1527(d) & (f)).

Although an ALJ must consider all medical opinions in conjunction with any other relevant evidence received in order to determine if a claimant is disabled, 20 C.F.R. § 404.1527(b), she need not specifically address each piece of evidence to adequately consider the

19

record in its entirety.  See Loral Def. Sys.-Akron v. N.L.R.B., 200 F.3d 436, 453 (6th Cir. 1999) ("the fact that the ALJ's opinion failed to discuss all of the testimony and evidence presented to him does not mean that the ALJ 'failed to consider' the evidence.") (quoting NLRB v. Beverly Enterprises-Massachusetts, 174 F.3d 13 (1st Cir. 1999)).

Here, the ALJ explained the basis for her assessed RFC by considering Plaintiff's symptoms and subjective complaints, medical records, physician opinions, daily activities, and diagnostic test results.  [Tr. 20-24].  The ALJ specifically considered the opinions of treating, non-treating, and non-examining physicians, including Drs. Wahby, Bismar, Wright, Samaratunga, Germain, and Freedom Disability Representative, Stephanie Comins.  [See Tr. 27-30].  In determining the weight assigned these medical opinions and Plaintiff's credibility, the ALJ considered the consistency of the medical opinions with the record as a whole, Plaintiff's treatment records, daily activities, and medication, the nature and extent of Plaintiff's treatment relationships, the diagnostic test results, and the specialization of the medical sources.  [See Id.].  The Court finds that the ALJ's RFC analysis satisfies agency regulation and is supported by substantial evidence.  Plaintiff specifically takes issue with the ALJ's consideration of Drs. Bismar and Germain, and the Court will address these opinions in turn.

### 1.  Dr. Bismar

The Plaintiff claims that the ALJ erred in granting Dr. Bismar little weight by failing to apply "'all' of the factors identified in the Social Security Regulations[.]" [Doc. 17 at 9].  The Court disagrees.

The undersigned concurs with Plaintiff that Dr. Bismar was a treating source who submitted a treating physician opinion, thereby warranting either controlling weight or "good reasons" for the weight assigned.  See 20 C.F.R. § 404.1527(c)(2).  The ALJ considered Dr.

20

Bismar's treatment records and Pulmonary RFC Questionnaire and accorded his opinion little

weight. [Tr. 28-29]. In assigning Dr. Bismar little weight, the ALJ explained:

> First, the doctor failed to answer a question regarding whether or
> not the claimant's impairments are reasonably consistent with her
> symptoms and opined limitations . . . Further, the course of
> treatment pursued by the doctor has not been consistent with what
> one would expect if the claimant were truly disabled, as the doctor
> has reported. The possibility always exists that a doctor may
> express an opinion in an effort to assist a patient with whom he or
> she sympathizes for one reason or another. Another reality, which
> should be mentioned, is that patients can be quite insistent and
> demanding in seeking supportive notes or reports from their
> physicians, who might provide such a note in order to satisfy their
> patients' requests and avoid unnecessary doctor patient tension.
> While it is difficult to confirm the presence of such motives, they
> are more likely in situations where the opinion in question departs
> substantially from the rest of the evidence of record, as in the
> current case.

[Tr. 29].

The Court finds that the ALJ's reasoning is sufficient to make clear to a subsequent

reviewer the basis for the weight assigned Dr. Bismar. See Soc. Sec. Rul. 96-2p, 1996 WL

374188, at *5. The ALJ applied many of the factors set forth in 20 C.F.R. § 404.1527(c)(2-6),

specifically considering the course of Plaintiff's treatment record with Dr. Bismar, her subjective

complaints, diagnostic test results and spirometry breathing test results, and medication regimens

throughout the length of her treatment, the nature and extent of the treatment relationship, the

opinion's consistency with the record as a whole, the specialization of Dr. Bismar, and other

factors which tend to support or contradict the opinion. [See Tr. 26-27] (documenting Plaintiff's

treatment record, examination dates, and Dr. Bismar's diagnosis and treatment plans); [Tr. 26]

(noting that Dr. Bismar was Plaintiff's treating primary care physician); [Tr. 29] (finding Dr.

Bismar's opinion to be inconsistent with his own prescribed course of treatment and "the rest of

the evidence of record"); [Tr. 29] (considering other factors that may have contributed to Dr. Bismar's failure to fully complete the pulmonary questionnaire).

The Plaintiff contends that the ALJ erred in not applying all of the factors set forth in 20 C.F.R. § 404.1527(c)(2-6). [Doc. 17 at 9]. The Plaintiff further contends that the ALJ's reasoning is flawed and that "each factor weighs heavily in favor of Dr. Hisham Bismar's opinions being entitled to controlling weight." [Id. at 9, n.2]. The Court finds that both of these arguments are flawed. First, the ALJ need not apply each factor set forth in 20 C.F.R. § 404.1527(c)(2-6), but need only address the factors necessary to set forth her reasoning with clarity and specificity. See Francis, 414 F. App'x at 804-05; Friend, 375 F. App'x at 551. Further, it matters not whether the Plaintiff or the undersigned disagree with the ALJ's reasoning or would have applied the factors differently. See Crisp, 790 F.2d at 453 n.4. The ALJ may operate in a "'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton, 246 F.3d at 773 (quoting Mullen, 800 F.2d at 545).

The Court has also considered Plaintiff's arguments regarding the ALJ's consideration of Dr. Bismar's failure to fully complete the questionnaire and the ALJ's speculation as to Dr. Bismar's motivation in finding such marked impairments. [See Doc. 17 at 9-10] (arguing that Dr. Bismar's failure to answer a single question "should not render his opinion in valid."); [Id. at 11] (claiming that it was improper for the ALJ to speculate as to Dr. Bismar's motivation and possible sympathy for Plaintiff's situation). The Court finds that both of these arguments are of no consequence. The ALJ's reasoning in this regard is but a portion of her explanation as to why Dr. Bismar's opinion was granted little weight. The ALJ did not dismiss Dr. Bismar's opinion solely because he failed to fully complete the pulmonary questionnaire. Nor did the ALJ find Dr. Bismar's opinions to warrant little weight based only on the ALJ's own speculation regarding

22

Dr. Bismar's motives. Although the Court does not give any weight to the ALJ's speculation regarding Dr. Bismar's motivation, the ALJ's notation that Dr. Bismar's opinion differs from the "rest of the evidence of record" holds water. [Tr. 29]. Further, the ALJ's speculation as to Dr. Bismar's motivation was only one factor out of many considered by the ALJ. The ALJ thoroughly considered Plaintiff's treatment relationship with Dr. Bismar and found his opinion inconsistent with his own treatment plan and the record as a whole. The records supports the ALJ's reasoning. [See Tr. 412] (Dr. Bismar noting that Plaintiff had positive results on Prednisone); [Tr. 538] (Dr. Bismar's plan to assist Plaintiff in "resolving exacerbation of asthma" by continuing her medications and tapering her Prednisone); [Tr. 388] (CT scan of chest and sinuses and x-ray of chest with largely unremarkable results); [Tr. 516] (licensed rheumatologist, Dr. Bajaj, noting that Plaintiff's CT of the sinuses and chest were unremarkable."); [Tr. 463] (Dr. Wright finding no severe medically determinable impairment); [Tr. 598-605] (Dr. Samaratunga assessing relatively benign physical limitations).

The Court finds that the Plaintiff's arguments regarding Dr. Bismar are without merit. Although Dr. Bismar was a treating physician, the ALJ provided sufficient explanation for not granting his opinion controlling weight and applied the factors set forth in 20 C.F.R. § 404.1527(c)(2-6) in weighing Dr. Bismar's opinion. Such analysis conforms to agency procedure and is supported by substantial evidence.

**2. Dr. Germain**

The Plaintiff next argues that the ALJ erred in the weight assigned to Dr. Germain. Specifically, Plaintiff contends that the ALJ granted Dr. Germain great weight but failed to include her assessment in Plaintiff's RFC. [Doc. 17 at 13-15]. The Court disagrees.

The ALJ explained that the "opinions of the experts who prepared the State Agency (DDS) reports are given the greatest weight." [Tr. 28]. She then specifically considered Exhibit 13F, Dr. Germain's psychiatric RFC assessment. [Id.]. The ALJ noted that the "DDS psychologist opined that the claimant is able to understand, remember, and carry out detailed, but not complex, instructions, make decisions, concentrate for extended periods, interact with other[s], and respond to changes[.]" [Id.]. The ALJ explained that "[t]hese expert opinions are balanced, objective, and consistent with the evidence of record as a whole. The claimant has never sought treatment from a mental health profession, and has repeatedly denied any symptoms." [Id.].

The Court finds Plaintiff's argument that the ALJ did not properly include Dr. Germain's assessment in her RFC to be incorrect. The ALJ's interpretation of Dr. Germain's assessment, as set forth above, is correct. Dr. Germain diagnosed Plaintiff with major depression but found she was only mildly limited in activities of daily living and social functioning, moderately limited in maintaining concentration, persistence, or pace ("CPP"), and had no episodes of decompensation. [Tr. 587, 594]. Dr. Germain noted that the "totality of the evidence indicates no mental health problems with treating source except for one passing mention indicating some potential of depression and anxiety disorder secondary to her medical condition." [Tr. 596]. Dr. Germain explained that "when the respiratory problems are not acting up, claimant is highly functional and has hobbies and does tasks where focus and concentration need to be [within normal limits]." [Id.]. The ALJ granted Dr. Germain great weight and determined that, "[f]rom a mental standpoint, the claimant retains [the ability] to understand, remember, and carry out detailed, but not complex instructions." [Tr. 25].

The Court finds no discrepancy in the ALJ's RFC and Dr. Germain's opinion. Dr.

24

Germain opined that there was little evidence of mental health problems and that "there [was] no indication that claimant's focus and concentration are poor[.]" [Tr. 596]. The ALJ's RFC is consistent with Dr. Germain's benign limitations. Plaintiff contends that the ALJ's error was harmful because "had the ALJ properly included Dr. Jean Germain's limitation concerning interaction with the general public, the Plaintiff could not perform her past relevant work as an office clerk as the ALJ found." [Doc. 17 at 14-15]. This argument is of no moment because Dr. Germain found that Plaintiff had only mild limitations in social functioning. [See Tr. 596] (explaining that although Plaintiff did not "go out as much now and has curtailed some social and other activities as a result of her respiratory problems, a careful review of [the] evidence does not support agoraphobic avoidance or an inability to function as a result of any mental limits."); [Tr. 594] (finding only mild limitations in social functioning).

Further, the Court notes that the ALJ was under no obligation to adopt Dr. Germain's assessment in full. See 20 C.F.R. § 404.1527(e)(2)(1). The ALJ was free to adopt or disregard Dr. Germain's opinion in full or in part. See id. Even after granting Dr. Germain great weight, the ALJ was free to adopt Dr. Germain's in full or in part in the assessed RFC. The ALJ's only obligation was to explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist[.]" 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ did so and the Court finds no error in this regard. The ALJ explained her reasoning and applied several of the factors set forth in 20 C.F.R. §§ 404.1527(c)(2-6) and 416.927(c)(2-6), such as the treatment relationship and the consistency and supportability of Dr. Germain's opinion. See 20 C.F.R. § 404.1527(e)(2)(ii); Jericol Mining, Inc., 301 F.3d at 710. The Court finds that the Plaintiff's argument in regards to the ALJ's consideration of Dr. Germain is without merit.

**C.    Whether the ALJ Erred in Finding Plaintiff Can Perform Past Relevant Work**

Plaintiff contends that the ALJ erred in finding Plaintiff can perform past relevant work. The Court disagrees. "A claimant bears the burden of proving she cannot perform her past relevant work either as she performed the job or as the job is generally performed in the national economy." Ellis v. Astrue, No. 3:11-CV-535, 2012 WL 5304203, at *5 (E.D. Tenn. Oct. 4, 2012) (internal citations omitted)) (citing Studaway v. Sec'y of Health and Human Servs., 815 F.2d 1074, 1076 (6th Cir. 1987)). However, "the Commissioner's decision must explain why the claimant can perform the demands and duties of the past job[.]" D'Angelo v. Comm'r of Soc. Sec., 475 F. Supp. 2d 716, 723 (W.D. Mich. 2007); see also 20 C.F.R. § 404.1520(f) (explaining that "we will compare our residual functional capacity assessment . . . with the physical and mental demands of your past relevant work."); Simpson v. Colvin, 3:11-0481, 2013 WL 4456383, at *17 ("the ALJ must 'explain *why* the plaintiff can perform the demands and duties' of her past work." (quoting D'Angelo, 475 F. Supp. 2d at 723-24) (emphasis in the original).

An ALJ may obtain evidence about the requirements of a claimant's past relevant work from many sources. An ALJ "may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles ("DOT")'" for the information she needs to obtain evidence to help her determine if the claimant is capable of performing past relevant work, in accordance with claimant's RFC. 20 C.F.R. § 404.1560(b)(2).

Once an ALJ finds that a claimant can perform past relevant work, a finding of "not disabled" is appropriate. See SSR 82-62, 1982 WL 31386, *3 (S.S.A. 1982). In order to make that assessment, "[p]ast work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." Id. Past relevant work includes not only "the specific job a

26

claimant performed" but also "the same kind of work as it is customarily performed throughout the economy[.]" Id.

In this case, the ALJ found that the Plaintiff was capable of performing her past relevant work as an office clerk. [Doc. 30]. In determining the requirements of the Plaintiff's past relevant work, the ALJ relied on the testimony by VE, Susan Brooks. [Id.]. The ALJ stated that:

> Ms. Brooks explained that an office clerk position requires a light exertional level and is semi-skilled . . . In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. Ms. Brooks testified that the demands of the office clerk position would not conflict with the claimant's residual functional capacity.

Id.

The Plaintiff contends that this analysis is flawed because the DOT's definition of office clerk is inconsistent with her RFC. [Doc. 17 at 15-16]. The Plaintiff points the Court to DOT 219.362-010 and argues the DOT's requirement of a reasoning level of four is inconsistent with her RFC limiting her to light, semi-skilled work. [Doc. 17 at 15]. The Court disagrees. Plaintiff is correct that the ALJ must resolve any discrepancy between VE testimony and the DOT. See SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) ("When there is an *apparent unresolved* conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.") (emphasis added). However, the Plaintiff is incorrect that "an apparent unresolved conflict" exists in Ms. Brooks's testimony and DOT 219.362-010. Ms. Brooks testified that "I would classify past work as an office clerk which is light, semiskilled work, with and [a specific vocational preparation ("SVP")] of a 4; the DOT code is 219.362-010." [Tr. 67].

DOT 219.362-010 does indeed list the position of "administrative clerk" as light work with an SVP of 4. Semi-skilled work correlates with a SVP of 3-4. See Towns v. Comm'r of Soc. Sec., No. CIV.A. 12-11786, 2013 WL 951046, at *4 (E.D. Mich. Feb. 21, 2013) (internal citations omitted) ("semi-skilled work corresponds to an SVP of 3–4"); Stull v. Astrue, No. 3:10-CV-00693, 2011 WL 830633, at *5 (N.D. Ohio Jan. 18, 2011) (internal citations omitted); [see also Tr. 83] (the VE at the first hearing testifying that a SVP of 4 qualifies as semi-skilled work).

The Plaintiff contends that the reasoning level of four conflicts with semi-skilled work, but does not cite the Court to any agency regulation or case law defining the relationship between semi-skilled work and reasoning levels. The Plaintiff notes that a "Reasoning Development of 4" requires a worker to "[a]pply principles of national systems to solve practical problems and *deal with a variety of concrete variables*[.]" (emphasis in the original) (citing DICOT at 191). The Court is not convinced that this requirement conflicts with the ALJ's RFC, finding that the claimant retains [the ability] to understand, remember, and carry out *detailed*, but not complex instructions." [Tr. 25] (emphasis added). The Court finds no apparent conflict in the requirement to deal with "concrete variables" and the limitation of carrying out "detailed, not complex instructions." See DICOT 219.362-010; [Tr. 25].

In investigating a plaintiff's past relevant work, the ALJ may rely on the DOT, Plaintiff's reports, or vocational analysis, see 20 C.F.R. § 404.1560(b)(2).; SSR 82-62, 1982 WL 31386 (S.S.A. January 1, 1982). Here, the ALJ relied on Ms. Brooks's testimony. Ms. Brooks specifically addressed the DOT and applied the requirements of the DOT 219.362-010 to Plaintiff's past relevant work as an office clerk. [Tr. 67]. The ALJ then asked Ms. Brooks if any part of her testimony conflicted with the DOT. [Tr. 71]. Ms. Brooks responded "[n]o ma'am." [Tr. 71]. Based on this testimony and the case law supporting the proposition that position

28

requiring a SVP of 4 correlates with semi-skilled work, the Court finds that there is no "apparent unresolved conflict" between Ms. Brooks's testimony and the DOT.  The Court finds that substantial evidence supports the ALJ's decision that Plaintiff could perform past relevant work and any argument to the contrary is without merit.

## VII.    CONCLUSION

Based upon the foregoing, it is hereby **ORDERED** that Plaintiff's Motion For Summary Judgment **[Doc. 17]** be **DENIED**, and the Commissioner's Motion for Summary Judgment **[Doc. 26]** be **GRANTED.**

**IT IS SO ORDERED.**

Enter:


_____s/ Thomas W. Phillips_____
UNITED STATES DISTRICT JUDGE